UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:  Ridge View Farm, LLC,                              Case No. 12-31700
                                                          Chapter 11
                              Debtor.

In re:  Ridge View Farm, LLC,                              Case No. 11-30463
                              Debtor.                      Chapter 12

### Memorandum-Decision and Order

Secured creditors Pleasant Acre Farms, LLC ("Pleasant Acre") and Germaine

Bourdeau ("Bourdeau") (together "Movants" or "Secured Creditors") have moved to

dismiss the chapter 11 case for lack of good faith or, alternatively, for relief from the stay

(the "Dismissal Motion").  Pleasant Acre has also filed a motion in the reopened chapter

12 case ("Motion to Modify Stay Order") which seeks to modify the terms of an order

granting relief from stay dated June 23, 2011 ("Stay Order").  The court conducted a joint

evidentiary hearing on the pending motions on October 15, 2012, requested further

briefing and reserved decision.

Upon review of the evidence adduced at the hearing and after due deliberation,

with the court taking judicial notice of Debtor's statements, filings, and actions in its

prior proceedings before this court, the court grants the Dismissal Motion and the Motion

to Modify Stay Order.  The court finds that Movants are entitled to *in rem* relief, pursuant

to 11 U.S.C. § 362(d)(4)(B), as to the subject real property and modifies the Stay Order to

grant *in rem* relief for a period of one year from the date of this order or for such time as

necessary for Movants to conclude a foreclosure sale of the subject real property,

whichever is sooner.

This memorandum-decision sets forth the court's findings of fact and conclusions of law in support of its determination. Fed. R. Bankr. P. 7052.

*Factual Background*

Ridge View Farm, LLC ("Debtor") avers that "[t]he nature of [its] business is farming."[1] Its principal asset is approximately 2,800 acres of farm land located in the towns of Hounsfield, Rutland, and Watertown, New York (the "Farm").[2] The Debtor claims the Farm holds "valuable mineral rights" and is improved by several buildings "suitable for living [which] are rented out when a demand exists." Debtor's Aff. at ¶¶ 3, 5. Because the Farm was leased out to neighboring farmers at the time the petition was filed, Debtor has no employees or payroll obligations. *Id.* at ¶¶ 5-6.

In order to secure a $2 million promissory note, Debtor granted a mortgage against the Farm in 2002 in favor of Anthony Verderame ("Verderame Mortgage"), as Trustee of the Trust under the Ninth Article of the Last Will and Testament of Frank Verderame (the "Verderame Trust" or "Trust"). Movants' Ex. 1. In 2006, Debtor granted a separate mortgage to Chase American Mortgage Company, LLC ("Chase"), which secured a $335,000 promissory note ("Chase Mortgage"). Movants' Ex. 2. The Trust simultaneously executed a Subordination Agreement as to the Verderame Mortgage in favor of Chase.

When the Debtor failed to pay according to the terms of the underlying note, the Trust commenced an action against the Debtor to foreclose the Verderame Mortgage. Movants' Exs. 1, 5. Also named as defendants were Joseph P. Spezzano ("father") and Joseph Spezzano III ("son") (together, the "Spezzanos"), members of the Debtor. In June

---

[1] Chapter 11 Debtor's Affidavit filed pursuant to Local Bankruptcy Rule 2015-2 (Case No. 12-31700, Doc. No. 57) ("Debtor's Aff."), ¶ 3.
[2] *See* Schedule A, Case No. 09-30498, Doc. No. 24; Movants' Ex. 69 at 4-5.

2

2008, a Judgment of Foreclosure and Sale was entered in the amount of $3,102,054.90 ("Verderame Judgment"). Movants' Ex. 5.

Subsequently, the parties entered into a stipulation in which the Debtor and the Spezzanos "expressly acknowledge[d] and consent[ed] to the [Verderame Judgment]." Movants' Ex. 6 at 4. The agreement postponed any foreclosure sale of the Farm and provided the Debtor the opportunity to pay a reduced settlement sum of $2.7 million according to an agreed schedule. The stipulation also provided that if payments were not made in accordance with the stipulated schedule, the Trust could proceed with a foreclosure sale and enforce its judgment at the face amount. *Id.* at 5. Debtor failed to make payments in accordance with the terms of the stipulation. October 15, 2012 Hearing Transcript ("Tr.") at 67-68.

On March 25, 2009, Debtor filed a chapter 12 case[3] in this court ("Ridge View I") — the first of three bankruptcy filings it would initiate. The Debtor filed the case in order to avoid a tax sale of the Farm. Ridge View I, Doc. No. 14. The case was ultimately dismissed on February 08, 2010 because Debtor failed to comply with the terms of a conditional order, namely, the requirement that it notice a hearing on confirmation of a chapter 12 plan.[4]

Debtor's filings in Ridge View I were incomplete. Debtor stated that it was owned by the father. Debtor valued the Farm on Schedule A at $1,934,469.80. Debtor's other scheduled assets, collectively valued at $161,470.08, consisted of land-rent receivables, farm equipment, cattle, hay, and $500 in a checking account. Debtor's

---

[3] Case No. 09-30498.
[4] The February 2010 dismissal was, in fact, the second dismissal in the case. The case was initially dismissed on June 12, 2009 due to Debtor's failure to comply with its obligations under § 521(a). The case was reopened on August 11, 2009 on Debtor's motion.

creditors[5] included: (1) the Trust, holding a secured claim of $2 million; (2) Chase, holding a secured claim of $400,000; and (3) the Jefferson County Treasurer, holding a tax lien in the amount of $186,058.52.[6]   Debtor reported net monthly income of $8,420.30, predominantly derived from land rentals of the Farm.

Six months after Ridge View I was dismissed, Chase commenced an action to foreclose its mortgage for Debtor's failure to make payments on the underlying note. Movants' Exs. 2, 9; Tr. at 25-26.  Chase obtained a Judgment of Foreclosure and Sale in the amount of $627,153.48, which was recorded on February 16, 2011 ("Chase Judgment").  Movants' Ex. 13.  At present, the debt owed on the Chase Judgment is somewhere between $725,000 and $730,000, exclusive of legal fees. Tr. at 26-27.

Debtor filed its second chapter 12 case[7] in this court on March 10, 2011 ("Ridge View II"), on the eve of a scheduled foreclosure sale of the Farm.  Shortly thereafter, Chase obtained relief from the automatic stay.  The Stay Order also granted Chase *in rem* relief for a period of one year.  Ridge View II, Doc. No. 30.  Without opposition from Debtor, Ridge View II was dismissed on August 24, 2011 for Debtor's failure to file a chapter 12 plan.  Ridge View II, Doc. Nos. 34, 43.

Debtor's Ridge View II filings, like its Ridge View I filings, indicated that Debtor was owned by the father.  As before, Debtor valued the Farm at $1,934,469.80.  In contrast to Ridge View I, Debtor scheduled other assets, collectively valued at $52,300, consisting of land-rent receivables, farm equipment, hay, and $100 in a checking account. As to its creditors, Debtor again scheduled the Verderame Mortgage at $2 million and the

---

[5]  Debtor did not file Schedules D, E, and F.  Creditors were identified in a proposed, but unconfirmed, plan and in the chapter 12 trustee's final report.  Ridge View I, Doc. Nos. 29, 33.

[6]  Debtor had seven other creditors, most unsecured.  Debtor valued only two of these creditor's claims. The valued claims totaled $34,356 or 1.3% of all claims.

[7] Case No. 11-30463.

Chase Mortgage at $400,000;[8] however, the County's tax lien increased by $72,022.66 to

$258,081.18. On Schedules I and J, Debtor reported net monthly income of $18,229.17,

derived from land-rental income and a purported sand and gravel pit operation.[9]  Ridge

View II, Doc. No. 17.

    In August 2011, about the time Ridge View II was dismissed, the father contacted

Bourdeau to ask if Bourdeau and/or Pleasant Acre, of which Bourdeau is a member,

would purchase the Chase debt in order to prevent a foreclosure sale of the Farm.  In

exchange, the father promised to repay Bourdeau in full by April 1, 2012 and, if he failed

to do so, he would sign over the deeds to the Farm to Bourdeau.  Tr. at 24.  Bourdeau

agreed to the deal, and the Chase debt was assigned to Pleasant Acre.  Movants' Ex. 18;

Tr. at 24-25.  No payments were made on the Chase debt. Tr. at 24.

    In February 2012, the Trust assigned its interest in the Verderame Judgment to

Bourdeau.  Movants' Ex. 33; Tr. at 36-38.  Since acquiring the Verderame Judgment,

Bourdeau has not received any payment on the debt. Tr. at 37-38.  At present, Bourdeau

estimates that the amount of the debt is $3.9 million. Tr. at 37-38.  Debtor has challenged

the validity and extent of Bourdeau's lien, as assignee of the Verderame Judgment, in a

separate adversary proceeding filed in the chapter 11 case.[10]

    On March 22, 2012, the same day as a scheduled foreclosure sale of the Farm,[11]

the father filed an individual chapter 12 case in the United States Bankruptcy Court for

the District of Connecticut (the "Connecticut court").  Movants' Ex. 32.  On Schedule A,

---

[8]  Debtor's other scheduled creditors included unspecified unsecured priority claims in the amount of $288,716.67 and a single unsecured non-priority claim of $32,830. Ridge View II, Doc. No. 17. These other claims totaled $321,546.67 or 10.8% of all claims.

[9]  Excising the income and expenses from the unconsummated sand and gravel pit operation, Debtor's net monthly income decreases to - $1,770.83. Ridge View II, Doc. No. 17.

[10]  Adv. Proc. 12-50023.

[11]  Movants' Ex. 68 - Notice of Sale, Ex. 5 to the Motion to Modify Stay Order. See also Ridge View II, Doc. No. 51.

the father claimed that he owned the Farm, which he valued at $7 million. This represents an increase in value of over $5 million for the Farm in just over one year's time. The father scheduled no other non-exempt assets. His schedules are silent as to any interest in the Debtor, but do list an unvalued ownership interest in Blue Rock Construction, LLC. The father scheduled secured claims in the amount of $961,000, consisting of the Verderame debt, which the father valued at $250,000, and the Chase debt, which the father valued at $711,000. The father's schedules do not reflect the County's tax lien.

As a result of the father's bankruptcy filing in Connecticut, Pleasant Acre's foreclosure sale of the Farm was tentatively adjourned until May 1, 2012. Movants' Ex. 31; Ridge View II, Doc. No. 51. On April 30, 2012, Pleasant Acre requested an Order to Show Cause in the state court as to why the foreclosure sale should not proceed, asserting, inter alia, that the father had no standing to oppose the motion. Ridge View II, Doc. No. 51. The state court denied the request, stating that any intervention on its part was stayed by the father's bankruptcy. Movants' Ex. 30.

On May 4, 2012, in response to the state court's ruling, Movants sought, on motion, an order from the Connecticut court declaring that the automatic stay in the father's case was inapplicable to Movants' foreclosure sale of the Farm. The Connecticut court granted the motion on June 6, finding that the stay did not apply to the foreclosure sale because Debtor was not the debtor before the court and that the codebtor stay did not apply. Movants' Ex. 35. The Connecticut court later dismissed the father's case. Movants' Ex. 37.

Nine days after the Connecticut court's June 6, 2012 order, Pleasant Acre filed

6

before this court a motion to reopen Ridge View II and the Motion to Modify Stay Order.
Ridge View II, Doc. Nos. 49, 51. In the Motion to Modify Stay Order, Pleasant Acre
seeks to extend the now expired one-year period during which *in rem* relief as to the
Farm had been granted for an additional three to twelve months in order to proceed with
the foreclosure sale. Ridge View II, Doc. No. 51.

While Pleasant Acre's motions were pending before this court, Debtor filed the
current chapter 11 case in Connecticut, marking its third filing in just over three years
("Ridge View III").[12] Ridge View III was filed 13 days after the expiration of the one-
year period during which *in rem* relief as to the Farm had been granted by the Stay Order.
On July 26, 2012, Secured Creditors filed the Dismissal Motion, followed shortly by a
motion to change venue to this court. Ridge View III, Doc. Nos. 17, 24.

In Ridge View III, Debtor scheduled only one asset, the Farm, which it values at
$7 million. Although no details of a transfer have been disclosed, according to Debtor's
schedules, equity ownership of Debtor had been transferred from the father to the son
sometime after Ridge View II. Debtor scheduled only three creditors: (1) the Verderame
Trust, holding a secured claim of $250,000; (2) Chase, holding a secured claim of
$711,000; and (3) the Jefferson County Treasurer, now holding a tax lien of $350,000.
Debtor reported no net monthly income.

By order entered August 15, 2012, this court reopened Ridge View II. As this
court considered the Motion to Modify Stay Order, the Connecticut court, by order
entered August 27, 2012, granted Movants' motion to change venue and transferred
Ridge View III, along with the related adversary proceeding, to this court. In light of the

---

[12] Case No. 12-31700, filed on July 6, 2012. Debtor's petition failed to disclose either of Debtor's Ridge
View I or Ridge View II filings. After the court raised the issue at a status conference held on September
27, 2012, Debtor amended its petition to disclose the omissions. Ridge View III, Doc. No. 56.

change of venue, the Connecticut court did not decide the Dismissal Motion.

At the October 15, 2012 joint evidentiary hearing, Movants offered the testimony of Bourdeau and appraiser David Fontana ("Fontana") and introduced, by stipulation, 75 exhibits into evidence. Tr. at 3, 20. In opposition, Debtor offered the testimony of Ronald C. Robbins ("Robbins") of the Robbins Family Grain Co., LLC ("Robbins Family Grain"), an unrelated farming operation and lessee of Debtor, and a proposed purchase and sale agreement between Debtor and Robbins for a portion of the Farm (the "Sale Agreement"). Debtor also offered the appraisal report of David A. Santacroce, Sr. ("Santacroce") and the testimony of appraiser Marlin James Nohle ("Nohle").

To date, Debtor has not filed a chapter 11 plan of reorganization.

### Robbins Family Grain Co., LLC and the Proposed Sale Agreement

Robbins and his family have engaged in farming operations in Jefferson County for over 35 years.[13] For the past 10 years, Robbins Family Grain has rented a portion of the Farm from Debtor. Tr. at 177, 185-186. Most recently, in March 2012, Robbins dealt with the father, as Debtor's representative, for the lease of 1,243 acres at $100 per acre. The leases were for the 2012 crop year and end per their terms on November 30, 2012. At the father's direction, Blue Rock Construction, LLC was named as payee or co-payee on the installment lease payments. Tr. at 186; Movants' Ex. 23-26.

At the evidentiary hearing, the Debtor introduced the Sale Agreement, which had been signed that day by Robbins and the father as Debtor's agent.[14]  Robbins agreed to purchase 512.55 acres, 380 of which are tillable, for $850,000. Tr. at 176, 178-183; Debtor's Ex B. The Sale Agreement is similar to a purchase offer submitted by Robbins

---

[13]  Among other businesses, Robbins operates an 859-cow dairy farm located near the Farm. Tr. at 177.
[14]  The father signed the agreement under a purported "power of attorney." No document granting the father power of attorney has been provided.

8

to Debtor in April 2012. Tr. at 188-189, 192; Movants' Ex. 29. Robbins formally submitted the offer in April; however, he and the father had been discussing a possible purchase of a portion of the Farm for over a year. Tr. at 188-190.

In addition to closing on the Sale Agreement, Robbins is interested in a long-term lease of the remainder of the Farm's tillable acres. Robbins estimates that the proposed leasehold interest would generate annual revenues of about $150,000 for the Debtor. Tr. at 183.

### The Parties' Appraisals

Secured Creditors offered the appraisal of Fontana. Tr. at 91-128; Movants' Ex 69. Fontana opined that the fair market value of the Farm, as of October 6, 2012, is $3.33 million or approximately $1,200 per acre. In valuing the Farm, Fontana utilized the sales comparison approach for which he used 26 comparable sales. Tr. at 100-103; Movants' Ex. 69 at 47-48. Of the approximate 2,800 acres of the Farm, Fontana indicated that about 1,760 acres are tillable. Tr. at 98; Movants' Ex. 60 at 5. Fontana stated that the distinction between tillable and non-tillable land is important because land that is tillable has utility for farmers. Tr. at 98. Non-tillable land does not have the same value for farmers and, in this case, Fontana stated that the non-tillable portion of the Farm is "totally useless." Tr. at 98.

Fontana personally inspected the Farm on October 5, 2012, including several buildings located on the property. Tr. at 96-98; Movants' Ex. 69 at 4. Fontana explained that a proper valuation of realty that contains improvements cannot be obtained without an inspection of the condition of the improvements. Tr. at 99. Fontana opined that the buildings on the Farm were generally "in very poor [or] fair condition." *Id.*

Fontana testified that his review of the County land records revealed that the property taxes on the Farm had not been paid since 2007, when only a nominal partial payment was made. Tr. at 127; *see* Movants' Ex. 54. Fontana testified that outstanding tax arrears for the 2007 tax year forward exceed $320,000. Tr. at 128; *see also* Movants' Ex. 54. Fontana testified that the tax records also indicate that there are tax arrears that predate 2006, although he was uncertain as to the amount. Tr. at 127-128.

Although Santacroce opined in his appraisal report that the Farm had a market value of $7 million, Fontana provided testimony that faulted Santacroce's appraisal on several grounds. First, although Santacroce determined a valuation figure using four comparable sales, Fontana testified that Santacroce did not accurately nor validly describe those sales. Tr. at 103-111. In substance, the errors in Santacroce's appraisal artificially inflate and/or misrepresent the per acre value of the Farm. Tr. at 107. Second, Fontana testified that Santacroce did not visit the property. Tr. at 111. Finally, Fontana testified that Santacroce failed to distinguish between the tillable and non-tillable acreage of the Farm. Tr. at 112. Due to the foregoing factors, Fontana testified that Santacroce's appraisal did not comport with acceptable standards and methodologies in the profession. The court credits Fontana's testimony as the only reliable indicia of value.

Santacroce, though disclosed as a witness, did not testify at the hearing. Instead, Debtor called Nohle to testify regarding the opinions offered in Santacroce's appraisal. Tr. at 141-142. As voiced by Movants' counsel at the hearing, Nohle was not a disclosed expert witness and, moreover, did not prepare an expert's report, much less Santacroce's report, as is required by Federal Rule of Bankruptcy Procedure 7026. Accordingly, the court disregards Nohle's testimony to the extent that he offered an opinion as to the

10

Farm's value and gives no weight to Santacroce's appraisal as he was not present to testify.[15]

Debtor offered the Sale Agreement in support of its ability to confirm a plan of reorganization. Debtor alleges that the proposed purchase price is reasonable and is evidence of the Farm's value. Curiously, however, the Sale Agreement proposes to sell 512.55 acres at a price of $1,658.37 per acre, notwithstanding that Debtor's appraiser valued the Farm on average at $2,518.89 per acre. *Compare* Debtor's Ex. B *and* Ex. A. When asked to evaluate the proposed sale, Fontana testified that the proposed sale price might be reasonable, although somewhat on the "high side" in terms of per acre value, and that the acreage identified in the Sale Agreement was "some of the prime land within the subject property." Tr. at 113-114. Debtor fails to explain how a sale of some of the Farm's best acreage at a rate 65.8% of its purported appraised value is either reasonable or an accurate measure of the Farm's value.

### *Arguments of the Parties*[16]

Movants allege that Debtor is a serial filer who, along with its insiders, is abusing the bankruptcy process in an impermissible attempt to frustrate and forestall its creditors by repeatedly preventing a foreclosure sale of the Farm. Relying upon *C-TC 9th Avenue Partnership v. Norton Co. (In re C-TC 9th Ave. P'Ship)*, 113 F.3d 1304 (2d Cir. 1997), Movants argue that Debtor filed its chapter 11 case in bad faith and, thus, ask that the case be dismissed or, alternatively, that the court grant relief from the automatic stay with additional *in rem* relief for two years.

---

[15] Furthermore, the methodology employed in the appraisal is questionable. After a detailed calculation of the Farm's value, Santacroce rounded up his valuation by $255,000 or 4% of value. Debtor's Ex. A at 68; Tr. at 164-165. The court finds that such rounding is untenable as part of good professional practice.

[16] Robbins Family Grain submitted a brief in support of Debtor's position; however, no arguments were made that would alter this court's determination of the instant motions.

Debtor responds that its chapter 11 filing was not made in bad faith. Debtor asserts that it could successfully reorganize, i.e., have sufficient cash to pay its three creditors, if permitted to proceed with the proposed sale of a portion of the Farm to Robbins and collect future rent proceeds from the remaining tillable acreage. Debtor claims, contrary to Secured Creditors' position, that the Farm is not over-encumbered. Instead, Debtor asserts that it has equity in the Farm based upon an asserted value of $7 million and its assertion that the debt owed to Bourdeau as assignee of the Verderame Judgment is significantly less than claimed.

### *Jurisdiction*

This court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and may enter a final order pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

### *Discussion*

The Bankruptcy Code[17] provides that a court, pursuant to 11 U.S.C. § 1112(b)(1), may dismiss a case or, pursuant to § 362(d)(1), grant relief from the automatic stay for "cause." Although not specifically enumerated in § 1112(b)(4), courts have found that a debtor's bad faith filing constitutes "cause" to dismiss a case. *See, e.g., Squires Motel, LLC v. Gance*, 426 B.R. 29, 34 (N.D.N.Y. 2010). Similarly, § 362(d)(1) does not define "cause;" nevertheless, "[i]t is well established that a debtor's bad faith filing constitutes cause for relief from the automatic stay." *In re 221-06 Merrick Blvd. Assocs.*, No. 1-10-45657, 2010 WL 5018265, at *3 (Bankr. E.D.N.Y. Dec. 3, 2010).

Whether a petition has been filed in bad faith is a factual inquiry. In this Circuit, a court must find "both [the] objective futility of the reorganization process and [debtor's] subjective bad faith in filing the petition." *In re Kingston Square Assocs.*, 214

---

[17] 11 U.S.C. §§ 101-1532 (2012) (hereinafter, "Code" or "Bankruptcy Code").

B.R. 713, 725 (Bankr. S.D.N.Y. 1997); *see C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d Cir. 1997); *In re AMC Realty Corp.*, 270 B.R. 132, 140-41 (Bankr. S.D.N.Y. 2001). "[A] determination of bad faith requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly." *In re C–TC 9th Ave. P'ship*, 113 F.3d at 1312.

To determine whether a debtor's petition was filed in bad faith, courts frequently engage in a factors-based analysis, considering factors "which 'are not substantively different from each other' whether used in the context of a motion to dismiss . . . under [§] 1112(b) . . . or a motion for relief from the automatic stay under [§] 362(d)(1)." *In re 68 West 127 Street, LLC*, 285 B.R. 838, 843 (Bankr. S.D.N.Y. 2002) (quoting *In re AMC Realty Corp.*, 270 B.R. at 141); *see Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995). The Second Circuit has provided eight factors which, if found, represent "adequate evidence" of a debtor's bad faith in filing its petition. *See In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311-12. These factors are:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees.

*Id.* at 1311 (quoting *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R.
828, 832 (W.D. Ky. 1992)).

In this case, it is clear that seven of the eight *C-TC* factors exist. Debtor has only
one asset, the Farm, which is subject to two foreclosure judgments that resulted from
Debtor's payment defaults. Debtor listed no unsecured creditors in Ridge View III, and
the few unsecured creditors that were scheduled in Ridge View II hold claims that are
insignificant when compared to the secured claims.[18] Insofar as the secured debts arising
under the foreclosure judgments are now held by Pleasant Acre and its member
Bourdeau, Debtor's financial travails involve, in essence, a two-party dispute that has
already been resolved in the state court foreclosure proceedings including fixing the
amount of the outstanding secured debt. Debtor has no cash flow and no employees.
Finally, Debtor's lack of current cash flow, reserves, or other assets render it unable to
meet its expenses including the real estate taxes on the Farm, which have gone unpaid—
in whole or in part— for at least five years.

As to the final *C-TC* factor, whether the timing of the debtor's filing evidences an
intent to delay the legitimate efforts of its secured creditors, the court concludes that the
evidence weighs in favor of the Movants. The court cannot overlook the fact that its Stay
Order granted a one-year period of *in rem* relief as to the Farm and that but for the filing
of the father's individual chapter 12 case, Movants could have completed a foreclosure
sale of the Farm before the expiration of the one-year period. The court finds
disingenuous the father's claim in his chapter 12 case that he held an ownership interest
in the Farm in light of his earlier sworn filings in the cases before this court. Finally, the
court notes that Debtor filed Ridge View III one month after Movants obtained the order

---

[18] $32,830 as compared to $2,979,627.85.

from the Connecticut court declaring the stay in the father's individual case inapplicable and 13 days after the expiration of the one-year period of *in rem* relief granted in the Stay Order.

An additional factor sometimes considered by courts in conducting a bad faith analysis, and particularly pertinent here, is whether the debtor, or entities or persons closely related to the debtor, have previously filed for bankruptcy. *See In re Shar*, 253 B.R. 621, 630 & nn. 5, 6 (Bankr. D.N.J. 1999); *In re Spectee Group, Inc.*, 185 B.R. 146, 156 (Bankr. S.D.N.Y. 1995); *see also In re 234-6 West 22nd St. Corp*, 214 B.R. 751, 757-58 (Bankr. S.D.N.Y. 1997). Counting the father's individual case, Ridge View III marks the fourth bankruptcy filing involving the Farm in little more than three years. Each prior case was dismissed without any plan being confirmed. Although "a [subsequent] chapter 11 filing . . . may be justified where the circumstances change from the prior proceeding," *In re 234-6 West 22nd St. Corp*, 214 B.R. at 757, Debtor has failed to demonstrate any change in circumstances that would lead the court to conclude that Debtor's chance at successfully confirming a viable reorganization plan has improved. *Id.* at 757-759.

Debtor argues that its circumstances have changed because Debtor is represented by new counsel. Debtor asserts that it was a "victim" of the "bad acts" of its prior counsel, whom it alleges had "conflicting loyalties" in negotiating Bourdeau's acquisition of the Verderame debt. Debtor's Post-Hearing Brief, at 7-9 (Ridge View III, Doc. No. 68). There is simply no support for Debtor's allegation that its situation is attributable to the conduct of its prior counsel. At the time of the assignment, nearly six months had passed since Ridge View II had been dismissed. Bourdeau testified that although

15

Debtor's prior counsel "made the first attempt" on behalf of Bourdeau to purchase the

Verderame debt, Bourdeau finalized the deal on his own. Tr. at 59-60, 64.[19]

Once a movant establishes by a preponderance of the evidence both the debtor's

subjective bad faith and the objective futility of a reorganization, "a rebuttable

presumption of bad faith arises and the burden shifts to the debtor 'to establish good and

sufficient reasons why the relief should not be granted.' " *Squires Motel, LLC*, 426 B.R.

at 34 (quoting *California Mortg. Serv. v. Yukon Enters., Inc. (In re Yukon Enters., Inc.)*,

39 B.R. 919, 921 (Bankr. C.D. Cal. 1984)). A debtor must then demonstrate the presence

of "unusual circumstances" that establish that "dismissal is not in the best interests of

creditors and the estate." 11 U.S.C. § 1112(b)(2). In this case, Debtor has failed to

allege, much less prove, any "unusual circumstance" that might suggest that dismissal or

stay relief is not "in the best interest of the creditors and the estate." *Id.*

Debtor contends that the Farm is "wholly unmarketable" because of a claim

allegedly asserted by the Trust that "[the Trust] continues to have a mortgage in the full

amount of $2 million on the Spezzano[s'] Connecticut properties." Debtor's Post-

Hearing Brief, at 4 ¶ 16. Debtor has failed to provide any legal authority and, moreover,

any factual support for its contention. The issue as it relates to the Farm, if timely raised,

would have been resolved in the foreclosure action that resulted in the Verderame

Judgment. Debtor elected not to appeal that judgment.[20] Instead, Debtor opted to enter

into a stipulation in which, along with the Spezzanos, it expressly acknowledged the

---

[19]   The court notes that Bourdeau testified that Debtor's prior counsel assisted Pleasant Acre in the acquisition of the Chase debt; however, Debtor has not alleged a conflict of interest arising from that transaction.

[20]   Contrary to Debtor's assertion, the Verderame Judgment is silent as to the father's Connecticut properties. Instead, the judgment references the mortgage premises as those "more particularly described on Schedule 'A'," which, incidentally, identifies the various parcels making up the Farm. Movants' Ex. 5.

validity of the Verderame Judgment. Notably, Anthony Verderame, Trustee of the Trust, was disclosed as a witness for the Debtor but was not produced nor subpoenaed to appear at the hearing. Of further note, the father, who was disclosed on Debtor's witness list, appeared at the hearing but never testified. Accordingly, the court gives no credence to Debtor's unsupported contention.

Contrary to Debtor's assertion, the proposed sale to Robbins Family Grain is inadequate to fund a feasible plan as Debtor's uncontested secured debts— namely the Chase debt and the County's tax lien— exceed the purchase price by $211,000. Further, Debtor appears to ignore Movants' right to credit bid on any § 363(b) sale. Contrary to Debtor's further suggestion, the proposed sale could not be made "free and clear" of all encumbrances since the Secured Creditors do not consent to the sale. *See* § 363(f).

"[T]here is a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose."[21] Nevertheless, the court finds that Movants have demonstrated by a preponderance of the evidence that Debtor's repeated filings are improper attempts to prevent them from enforcing their rights as to the Farm. There is no evidence that Debtor had a legitimate subjective intent to reorganize at the time the petition was filed. Further, Debtor has not demonstrated any change in circumstances since its prior filings, or proffered any evidence, that would suggest that Debtor could reorganize and successfully emerge from bankruptcy.

***Conclusion***

For the reasons stated, this court finds that cause exists to dismiss the chapter 11 case. The court further finds cause to vacate the automatic stay as to the Farm pursuant

---

[21] *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 228 (2d Cir. 1991) (internal quotation omitted).

to 11 U.S.C. § 362(d)(4) and grants *in rem* relief as to the Farm for a period of one year

or such time as may be necessary for Movants to conclude a foreclosure sale, whichever

period is sooner.    Should the Farm be deemed property of the estate in any new

bankruptcy case, whether the subject of a voluntary or involuntary filing during the

interim, the automatic stay shall not apply to the Farm nor to Movants and or their

assigns who may proceed with a foreclosure sale of the Farm without obtaining further

relief from the automatic stay.

    So Ordered.

Dated:  December 10, 2012
       Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge

18